## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID LEE JACKSON,

                Plaintiff,

     v.

THE FEDERAL BUREAU OF
PRISONS, HUGH HURWITZ, J. RAY
ORMOND, MICHAEL CARVAJAL,
and DAVID J. EBBERT,


                Defendants.

**Case No.**


**ELECTRONICALLY FILED**

## CIVIL COMPLAINT

Plaintiff David Lee Jackson hereby respectfully complains as follows against Defendants, the Federal Bureau of Prisons ("BOP"), Hugh Hurwitz in his official capacity as Acting Director of BOP, J. Ray Ormond in his official capacity as Regional Director of the Northeast Region of BOP, Michael Carvajal in his official capacity as Assistant Director of Correctional Programs Division at the BOP, and David J. Ebbert in his official capacity as Warden of the United States Penitentiary at Lewisburg ("USP Lewisburg").

## INTRODUCTION

1.    This lawsuit concerns the Defendants' unconstitutional and inhumane treatment of David Lee Jackson, a prisoner in BOP custody who suffers from serious mental illness and is intellectually disabled. The complaint specifically

relates to the Defendants' repeated designation of Mr. Jackson to the Special Management Unit (SMU), currently operated out of USP Lewisburg, where Mr. Jackson twice has been confined in extreme isolation and deprived of adequate mental health treatment to manage symptoms of his mental illness and of the supports he needs in connection with his intellectual disability, and where his condition deteriorated as a result of his confinement there.

2.     Mr. Jackson has struggled with serious mental illness for much of his life. BOP personnel diagnosed Mr. Jackson with paranoid schizophrenia and depression with accompanying psychosis, and he has intermittently and inconsistently been prescribed powerful antipsychotic medications to manage his symptoms while in BOP custody.  Mr. Jackson has an IQ at or below 70 and limited adaptive functioning consistent with intellectual disability (formerly referred to as mental retardation) that dates back to his childhood.[1]  He also suffers from the effects of prolonged and repeated exposure to traumatic insults over the course of his childhood.  As discussed in further detail below, the interplay of Mr. Jackson's biology and background, combined with the restrictive conditions of confinement and lack of adequate mental health care in the SMU, make him

---

[1]     The American Association of Intellectual and Developmental Disabilities defines intellectual disability as "a disability characterized by significant limitations in both intellectual functioning and in adaptive behavior, which covers many everyday social and practical skills. This disability originates before the age of 18." *See* **Exhibit 1**, *available at* www.aaidd.org/intellectual-disability/definition.

120731966_3

especially vulnerable to psychological deterioration in the Special Management Unit ("SMU") at USP Lewisburg.

3.   In the SMU, where prisoners are placed under more restrictive conditions of confinement than those of general population, Mr. Jackson was held in a tiny cell (on average, eight by eleven feet in size) sometimes with another inmate, for at least 23 hours a day.

4.   Despite being aware of Mr. Jackson's serious mental illness and intellectual disability, and although formal BOP policies provide that men with serious mental illness not be designated to SMU programs except in cases of extraordinary security needs, since 2013[2] the BOP designated Mr. Jackson to the USP Lewisburg SMU program twice for extensive periods, first in June 2015 and again in January 2018.

5.   In both instances, the BOP transferred Mr. Jackson as the result of a non-violent disciplinary infraction.

6.   Also in both instances, Mr. Jackson attempted to persuade decision-makers that the SMU designations were not appropriate in light of his mental

---

[2]     Mr. Jackson has been serving a life sentence without the possibility of parole since March 2013, when the U.S. Attorney for the Eastern District of Texas conceded it committed a *Brady* violation in what was, at the time, a federal death penalty case. Mr. Jackson was originally sentenced to death in that case in 2006 for his involvement, along with a co-defendant, in the killing of another inmate while incarcerated at the U.S. Penitentiary in Beaumont, Texas. During the course of his post-conviction proceeding, prosecutors turned over previously undisclosed documents from Mr. Jackson's BOP files showing Mr. Jackson had been diagnosed in 2005 with paranoid schizophrenia while in BOP custody.

120731966_3

health history and intellectual disability.  During the course of both of these SMU

placements, Mr. Jackson repeatedly sought professional help from BOP personnel

to manage worsening symptoms of his mental illness that he experienced in the

SMU's harsh, restrictive conditions of confinement.  Mr. Jackson's efforts were

met with a callous indifference to his mental health needs.

7.     This lawsuit seeks to enjoin Defendants from designating Mr. Jackson

to the SMU program.  Consistent with the requirements of the Eighth Amendment,

the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, and BOP policies

related to treatment and care of inmates with mental illness, Mr. Jackson seeks

declaratory and injunctive relief prohibiting Defendants from designating him for

placement in the SMU program in light of his serious mental illness, intellectual

disability, and deteriorating mental health and physical condition.

## JURISDICTION

8.     This Court has subject matter jurisdiction over the allegations

presented herein pursuant to 28 U.S.C. § 1331, in that the claim for injunctive

relief arises under the United States Constitution and federal statutes, including 5

U.S.C. § 702 which waives sovereign immunity for an action seeking relief other

than monetary damages against an agency.  The request for declaratory relief is

based upon 28 U.S.C. § 2201, in that an actual controversy exists between

Defendants and Mr. Jackson over their repeated placement of him in the SMU program, in violation of rights guaranteed by the United States Constitution.

## VENUE

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to Mr. Jackson's claim occurred or will occur in Union County, Pennsylvania, in the Middle District of Pennsylvania, where the SMU program is currently operated.

## PARTIES

10.     The plaintiff, Mr. Jackson, is currently housed at the United States Penitentiary at Pollock, Louisiana ("USP Pollock").

11.     Mr. Jackson has been diagnosed with serious mental illness, including paranoid schizophrenia and depression.

12.     Mr. Jackson is also intellectually disabled.

13.     On two separate occasions, the BOP transferred Mr. Jackson into USP Lewisburg and housed him in the SMU.

14.     The care that Mr. Jackson received in the SMU program at USP Lewisburg for his ongoing serious mental illness was constitutionally deficient and otherwise failed to satisfy Defendants' legal obligations to Mr. Jackson. Specific facts about the lack of adequate care and his deteriorating condition are set forth below.

120731966_3

15.     Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice (U.S. DOJ) and is responsible for the administration of federal prisons, including USP Lewisburg.  The BOP maintains physical custody of Mr. Jackson.

16.     The BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities.

17.     Defendant Hugh Hurwitz ("Hurwitz") is the Acting Director of the BOP.  He is sued herein in his official capacity.

18.     As Acting Director, Hurwitz oversees the operation of 122 BOP facilities, including USP Lewisburg which houses the SMU program where Mr. Jackson was confined for two separate periods.  Hurwitz's duties also include oversight and management of BOP staff and inmates.

19.     Defendant J. Ray Ormond ("Ormond") is the Regional Director for the Northeast Region, of which USP Lewisburg is a part.  He is sued herein in his official capacity.

20.     Ormond, according to BOP Program Statement 5217.02, reviews referral packets for inmates designated to the SMU and determines whether sufficient evidence exists to convene a hearing on an inmate's referral.  Following a hearing, Ormond, in his official capacity as Regional Director, "considers whether, based on the Hearing Administrator's findings, the SMU referral is

necessary to ensure the safety, security, or orderly operation of [BOP] facilities, or protection of the public," makes a recommendation as to the referral, and forwards the recommendation to the Designation and Sentence Computation Center ("DSCC").

21.     Defendant Michael Carvajal ("Carvajal") is the current Assistant Director of the Correctional Programs Division of the BOP.  He is sued herein in his official capacity.

22.     As Assistant Director of the Correctional Programs Division, Carvajal's areas of responsibilities include designations and unit and case management operations.

23.     According to BOP Policy Statement 5217.02, Carvajal, in his official capacity as Assistant Director of the Correctional Programs Division, makes the final decision with the DSCC to approve an inmate's designation to the SMU.

24.     Defendant David J. Ebbert ("Ebbert") is the current warden at USP Lewisburg. He is sued herein in his official capacity.

25.     According to BOP Policy Statement 5310.16, "Treatment and Care of Inmates With Mental Illness," as Warden, Ebbert is "responsible for the appropriate management of mentally ill inmates in his/her institution."  BOP Policy Statement 5310.16 further states that the BOP "strives to avoid prolonged

placement of inmates with serious mental illness in settings such as . . . the [SMU]."

## FACTUAL ALLEGATIONS

### Factual Allegations Pertaining To Bop's Creation And Operation Of The Special Management Unit (SMU)

26.     The BOP created the SMU program to house male inmates determined to have unique security and management concerns. Conditions of confinement for men in a SMU are more restrictive than for those in general population.  The SMU program is governed by formal BOP policy memorialized in BOP Program Statement 5217.02.

27.     According to Program Statement 5217.02, designation to the SMU is non-punitive, and is based on a determination that an inmate meets certain criteria for the "greater management" needs purportedly met by the SMU, as specified in the policy.  Program Statement 5217.02 requires that mental health staff evaluate inmates held in the SMU every 30 days.

28.     Through the multi-step SMU program, inmates progress through different levels until they "graduate" and are transferred to the general prison population or another appropriate facility.  Under Program Statement 5217.02, each different level has associated with it an expected time frame for completion: for Level 1, it is 6-8 months; for Level 2 it is 2-3 months; and for Level 3, it is 1-2 months. An inmate may remain at any given level for significantly longer than the

8

expected completion time if BOP makes a determination that the inmate is not ready to progress to the next level.  Inmates who receive disciplinary violations at any time in the SMU process can be sent back to Level 1 where they must begin the program over again.  Inmates can be in the SMU program for up to 24 months before being designated as "SMU FAIL" status.

29.    Inmates in the SMU must complete progressive milestones and are afforded privileges depending on what level attain. Inmates in Levels 1 and 2 encounter extremely restrictive and isolating conditions of confinement. They remain in their cells for 23 hours a day and by design have limited human contact.

30.    An individual inmate's progress through Level 1 is based on his compliance with behavioral expectations.  Progression through Level 2 is based on the inmate demonstrating potential for positive "community" interaction. Progression to Level 3 is based on the inmate's ability to demonstrate actual positive "community" interaction skills.

31.    All of the inmates in the SMU are allowed only a maximum of 5 hours of recreation time each week, spent in cages approximately eight feet by twenty feet.  Frequently, inmates are permitted less or no recreation time.

**Factual allegations pertaining to BOP's mental health care policies and provisions for inmates, including individuals placed in the SMU**

32.    BOP Program Statement 5310.16, "Treatment and Care of Inmates with Mental Illness," defines "serious mental illness" to include:

120731966_3

> Schizophrenia Spectrum and Other Psychotic Disorders.
> Bipolar and Related Disorders.
> Major Depressive Disorders.

33.     In addition, the BOP classifies the following diagnoses as serious

mental illnesses, especially if the condition is sufficiently severe, persistent, and

disabling:

> Anxiety Disorders
> Obsessive-Compulsive and Related Disorders.
> Trauma and Stressor-Related Disorders.
> Intellectual Disabilities and Autism Spectrum Disorders.
> Major Neurocognitive Disorders.
> Personality Disorders.

34.     BOP Program Statement 5310.16 also purports to "strive to avoid

prolonged placement of inmates with serious mental illness in settings such as

Special Housing Units (SHU) and the Special Management Unit (SMU)."

35.     The explicit purpose of Program Statement 5310.16 and the policies

therein is "to ensure that inmates with mental illness are identified and receive

treatment to assist their progress toward recovery, while reducing or eliminating

the frequency and severity of symptoms and associated negative outcomes of

mental illness."

36.     BOP also acknowledges that "[a]n inmate's mental health symptoms

may contribute to institution rule infractions."

37.     The policy details different mental health care levels created by BOP

to determine the needs of each prisoner:  Care1-MH indicates the individual has no

10

significant mental health care needs; Care2-MH indicates the individual should receive routine outpatient mental health care or crisis-oriented mental health care; Care3-MH indicates the individual should receive enhanced outpatient mental health care or residential mental health care; and  Care4-MH indicates the individual receive inpatient psychiatric care.

38.    In practice, BOP regularly downgrades inmates with serious mental illness to Care1-MH status or keeps inmates known to suffer from serious mental illness at Care1-MH.[3]

39.    In BOP Program Statement 6340.04, "Psychiatric Services," the BOP expresses a commitment to providing "essential cost-effective, high quality, and humane diagnostic and treatment services throughout … inmates' incarceration." The required services include "[r]isk assessment for acts of self-harm or harm towards others"; "[m]ental health screening of inmates suffering from symptoms or behavioral disturbances indicate of possible mental illnesses or disorders"; "[d]iagnosis and treatment of mild to moderate mental illnesses such as non-psychotic major depression, anxiety disorders, or sleep disorders"; "[c]ontinuation of psychiatric treatment initiated at other institutions or prior to incarceration"; and

---

[3]      *See* Christie Thompson and Taylor Elizabeth Eldridge, <u>No One to Talk You Down: Inside Federal Prisons' Dangerous Failure to Treat Inmates With Mental-Health Disorders</u>, Washington Post, Nov. 21, 2018, attached hereto as **Exhibit 2**.

"[m]onitoring of inmates on psychiatric medications for side-effects and drug interactions" among other services.

40.    Despite these commitments, the BOP system has an acute shortage of psychiatrists on staff to meet the needs of inmates, and falls well short of providing the services required under Program Statement 6340.04.[4]

41.    At the USP Lewisburg SMU, there is no psychiatrist on staff.  Mental health screening, diagnosis, and follow-up care at the USP Lewisburg SMU are wholly inadequate.

42.    The BOP's policy for transferring individuals to the SMU, memorialized in Program Statement 5310.16, states that "inmates referred for extended placement in restrictive housing (i.e., SMU) must be reviewed by Psychology Services staff to determine if mental health issues exist that preclude placement in this setting."

43.    Program Statement 5310.16 acknowledges the substantial risk to an individual's mental health posed by extended placement in restrictive housing settings such as the SMU program:  "The Bureau recognizes that an inmate's mental health may deteriorate during a restrictive housing placement."  In light of this recognition, the policy requires those in a restrictive housing setting receive "at a minimum, face-to-face mental health contacts consistent with the type and

---

[4]        *See id.*

frequency indicated by the [individual's] care level, to the extent feasible. These contacts take place in a manner that protects an inmate's privacy to the extent that safety and security of staff are not comprised," including "remov[al] [of SMU inmates] from their cells for private or extended interviews with Psychology and Psychiatry Services staff as a standard procedure."

44.     Moreover, among other explicit requirements, Program Statement 5217.02 indicates that in the SMU program, "[e]mergency mental health care is always available either at the institution or from the community. In addition, inmates with an identified need for routine and/or follow-up mental health services will receive these services in accordance with the Program Statements **Treatment and Care of Inmates with Mental Illness** and **Psychiatric Services**" (emphasis in original).

45.     Despite having policies in place that specify that inmates with serious mental illness should not be placed in the SMU absent extraordinary security needs, and that otherwise set out provisions to meet the needs of mentally ill prisoners, Defendants have twice designated Mr. Jackson to the SMU after BOP diagnosed him with a serious mental illness, where he was denied adequate mental health care and where his serious mental illness worsened.

120731966_3

**Factual Allegations Pertaining To BOP's Awareness That Extended Confinement In Isolation Can Have A Devastating Effect On Mentally Ill Inmates Such As Mr. Jackson**

46.    Solitary confinement refers to the practice of holding an individual in a cell, alone or with a cellmate, for between 22 and 24 hours per day.

47.    In solitary confinement inmates are isolated, unable to participate in normal social interaction with others, and subjected to severe restrictions that have an impact on every aspect of their lives.

48.    Defendants are well aware of the serious detrimental effects of long-term solitary confinement, and are aware that those with mental illness are uniquely vulnerable to deterioration of their conditions in such settings.  A 1999 study of "supermax" prisons conducted by the National Institute of Corrections and the U.S. DOJ, of which BOP is a sub-agency, concluded:

> Insofar as possible, mentally ill inmates should be excluded from extended control facilities.  Each inmate being considered for such a facility should have a mental health evaluation.  Although some mentally ill offenders are assaultive and require control measures, much of the regime common to extended control facilities may be unnecessary, and even counterproductive, for this population.[5]

49.    In response to an oversight hearing in the U.S. Senate that took place in June 2012, an independent, comprehensive report was released to the  BOP in

---

[5]       Chase Riveland, <u>Supermax Prisons: Overview and General Considerations</u>, U.S. Department of Justice National Institute of Corrections, 12 (January 1999), https://s3.amazonaws.com/static.nicic.gov/Library/014937.pdf.

120731966_3

December 2014, detailing  BOP's mismanagement of mental illness in restrictive

housing facilities, including at USP Lewisburg:

- Many inmates in restrictive housing are receiving insufficient or inappropriate mental health treatment;

- Many inmates in restrictive housing should not be assigned to such a facility due to their mental health conditions;

- No protocol exists to identify men with mental illness who should be kept out of restrictive housing; and

- Individuals often receive a mental health diagnosis by medical students or interns who are not trained in psychiatry, and once diagnosed, they rarely receive follow-up reassessments or proper medication.[6]

50. In November 2015, the District of Columbia Corrections Information

Council ("CIC")[7] released a report following an inspection of USP Lewisburg and

investigation into, among other things, mental health treatment at USP Lewisburg.

---

[6]     *See* Kenneth McGinnis, et al., Federal Bureau of Prisons: Special Housing Unit Review and Assessment, CAN Analysis & Solutions (December 2014), https://www.bop.gov/resources/news/pdfs/CNA-SHUReportFinal_123014_2.pdf.

[7]     The CIC is an independent monitoring agency established by the Revitalization Act of 1997.  The mission of the CIC is to inspect, monitor, and report on the conditions of confinement at facilities where D.C. residents are incarcerated, including BOP facilities.  The CIC reports its findings and recommendations to several officials and governmental bodies including the Director of the BOP.  The agency also releases reports on inspected facilities and issues an annual report regarding general issues affecting conditions of confinement for incarcerated DC residents.

120731966_3

The CIC determined that the Psychology Services staff at USP Lewisburg was unresponsive to individuals' "'mental health needs.'"   In the CIC's study, numerous men reported necessary mental health medication was discontinued; many others reported that their requests to be evaluated by a mental health professional went unanswered.[8]

51.   In its 2016 "Report and Recommendations Concerning the Use of Restrictive Housing," U.S. DOJ recognized that "inmates with serious mental illness ('SMI') should not be placed in restrictive housing" settings such as the SMU.[9]  It recommended that all inmates placed in restrictive housing be screened for signs of mental illness and that prisons implement policies and systems to conduct repeated and varied reviews—including multiple times per day—to determine whether inmates in solitary confinement are showing signs of mental illness.[10]

52.   For many years, therefore, Defendants have been on notice of the risks associated with the SMU's restrictive conditions of confinement for mentally ill inmates like Mr. Jackson.

---

[8]      Inspection Report: USP Lewisburg, District of Columbia Corrections Information Council, 25 (November 5, 2015), attached hereto as **Exhibit 3**.

[9]      Report and Recommendations Concerning the Use of Restrictive Housing, U.S. Department of Justice, 99 (January 2016), https://www.justice.gov/archives/dag/file/815551/download.

[10]      *Id.* at 101.

120731966_3

53.     Defendants, moreover, have actual knowledge of Mr. Jackson's serious mental illness and deteriorating condition from a variety of sources, including his medical records, his documentation of his attempts to obtain medical attention for his condition, his former attorneys' documented attempts to obtain treatment from BOP for his condition, and BOP officials' direct observation. Defendants nonetheless demonstrated a sustained and deliberate indifference to Mr. Jackson's medical needs, including turning a blind eye to the detrimental effects of SMU placement on his condition.

### Factual allegations relating specifically to David Jackson

54.     David Jackson, BOP Register Number 13567-039, is currently fifty-eight years old and incarcerated at USP Pollock.  Mr. Jackson has been in BOP's custody continuously since 2005.

55.     Mr. Jackson suffers from chronic and serious mental illness.  At various points in his life, he has been diagnosed with psychotic and mood disorders, including paranoid schizophrenia and Major Depressive Disorder. Although his symptoms ebb and flow, Mr. Jackson experiences recurring episodes that involve powerful mood swings, hallucinations, paranoia, racing thoughts, and pressured speech patterns; the symptoms worsen when he is under psychological stress such as that caused by restrictive conditions of confinement.  He has, at

times, been prescribed potent anti-psychotic medications that help him manage the symptoms.

56.    Mr. Jackson is also intellectually disabled.  He was first diagnosed as mentally retarded in grade school, and subsequently placed in special education where he remained for the rest of his schooling. Even in a special education high school in the early 1970s, he seldom tested above a second grade level. IQ tests administered to him during his childhood indicated his scores were in the range consistent with intellectual disability.  The school system in Detroit, Michigan, where he grew up, classified him as mentally retarded based in part on one of those IQ tests, on which he scored a 67.  As a child, Mr. Jackson failed to meet developmental milestones: as a second grader, for example, he struggled to dress himself, and was unable to tie his own shoes.  He also displayed significant deficits in his adaptive behavior, or daily living skills, including in the domains of self-care, communication, social-interpersonal skills, functional academic skills, and self-direction.  He was unable to read, write, or do simple math even as a teenager, and as an adult was never able to hold a job.

57.    During his childhood, Mr. Jackson was a victim of severe parental neglect and exposed to extreme psychological trauma.  He endured years of physical abuse at the hands of his father and witnessed his father viciously beating his mother and siblings, before his nightmarish home environment led him to run

away at the age of thirteen.  He developed an addiction to heroin and other substances in his early teens as a means of coping with his traumatic experiences. His exposure to neglect and trauma and chemical dependencies had significant adverse long term consequences for his brain development, especially when combined with his cognitive impairments and psychiatric vulnerabilities.

58.   The interplay of Mr. Jackson's serious mental illness, intellectual disability, and trauma history has made living in BOP custody without adequate support and medical care, including at the USP Lewisburg SMU, extremely difficult.  BOP's willful indifference to Mr. Jackson's medical needs have only worsened his illness.

59.   BOP designated and transferred Mr. Jackson to the SMU at USP Lewisburg on two separate occasions.

60.   Under the stress of the restrictive conditions there, the symptoms of Mr. Jackson's serious mental illness became acute and unbearable, and made his already compromised ability to advocate for mental health care for himself all the more insurmountable.

61.   Consistent with Mr. Jackson's medical history, Mr. Jackson suffered from powerful mood swings and paranoia, complained of racing thoughts and recurring nightmares, and displayed pressured speech while in the SMU at USP Lewisburg.

62.     Consistent with Program Statement 5310.16's acknowledgement that "[a]n inmate's mental health symptoms may contribute to institution rule infractions," BOP and its employees cited Mr. Jackson for violating institutional rules.  Mr. Jackson received disciplinary write-ups that served as a stated reason for BOP's repeated designation of Mr. Jackson to the SMU.

63.     Given his diagnoses of schizophrenia and intellectual disability, Mr. Jackson meets the criteria for having serious mental illness as defined in BOP Program Statement 5310.16.  According to BOP Program Statement 5310.16, BOP "strive[s] to avoid prolonged placement of inmates with serious mental illness in settings such as Special Housing Units (SHU) and the Special Management Unit (SMU)."  BOP claims that "[p]lacement of a seriously mentally ill inmate in the ADX or a SMU will only occur if extraordinary security needs are identified that cannot be managed elsewhere."

64.     Records from almost every BOP institution in which Mr. Jackson has been incarcerated since 2005 show that the Defendants are aware that Mr. Jackson meets the criteria for having serious mental illness.

65.     In 2005, while at USP Beaumont, BOP psychiatrist Dr. Richard Bouchat diagnosed Mr. Jackson with paranoid schizophrenia.

66.     At that time, BOP physicians already had prescribed Seroquel for Mr. Jackson, a powerful antipsychotic medication used to treat schizophrenia, bipolar disorder and depression, as well as Prozac, used to treat depression.

67.     These medications were prescribed for Mr. Jackson while he was held for an extended period in the Special Housing Unit (SHU), another form of restrictive housing employed by BOP.

68.     Dr. Bouchat described Mr. Jackson's presentation:

> bizarre appearance with soap or shaving cream on his face, civil yet guarded and argumentative at times…restrictive (distrustful) facies, normal flow to speech, rambling flow of thoughts at times, admits to "voices" but refuses to elaborate, (+) persecutory paranoia, irritable…[11]

69.     Dr. Bouchat also noted in the BOP record that, among other physical vulnerabilities, Mr. Jackson had a long history of IV drug use. Several months later while Mr. Jackson was still in the SHU, Dr. Bouchat prescribed Mr. Jackson Fluoxetine, the generic version of Prozac, and described Mr. Jackson as delusional and suffering from schizophrenia.[12]

70.     At various other points while Mr. Jackson was in BOP's custody, BOP personnel acknowledged that Mr. Jackson suffers from a serious mental illness in some form or another.  A psychological record from FTC Oklahoma

---

[11]     *See* Chronological Record of Medical Care, attached hereto as **Exhibit 4**.

[12]     *See* Chronological Record of Medical Care , attached hereto as **Exhibit 5.**

dated December 19, 2006 notes that "[a]vailable records indicate a diagnosis of Depression. Information from Health Services indicates he is currently prescribed Prozac and Risperdal,"[13] the latter of which is prescribed for schizophrenia and bipolar disorder and used to treat associated symptoms such as hallucinations, delusions, disorganized thinking, and trouble speaking clearly.

71.     During an intake screening for possible placement at ADX Florence a couple of weeks later, the following appears in a record:

> Inmate Jackson reported the following: Outpatient: Treatment since at least 2004 with Seroquel and Prozac. Currently taking risperidone and Prozac.

> Comments:

> Inmate Jackson transferring from USP Beaumont where he was for lengthy writ.  He was assessed for an initial Psychology Services Intake screening in R&D upon his arrival.   Inmate Jackson has a history of receiving psychiatric tx and currently is diagnosed with Depression NOS.  He has been taking medication at least since 2003 at which time he may have been experiencing depression with accompanying psychosis.   Recently he was prescribed risperidone to replace his previous prescription for Seroquel (when it was removed from the BOP formulary).  He is currently compliant with regimen of risperidone 2 mg and Prozac 40mg.[14]

72.     Psychological records from the several years Mr. Jackson spent in the Special Confinement Unit (SCU) at USP Terre Haute indicate Mr. Jackson had

---

[13]     *See* December 19, 2006 FTC Oklahoma Record, attached hereto as **Exhibit 6**.

[14]     *See* ADX Florence record, attached hereto as **Exhibit 7**.

past diagnoses of schizophrenia and depression. During one of the staff rounds there in 2010, it is noted that Mr. Jackson "requested that his prescription for Prozac be restarted. He described feeling frustrated by the recent increase in noise level on his unit and reported he has been experiencing 'mood swings'...he was encouraged to contact the pharmacy."[15]

73.    After being resentenced to a term of life without the possibility of parole in the Eastern District of Texas in March 2013, Mr. Jackson was transferred from USP Terre Haute SCU to USP Hazelton where he was housed with the general population.    Within four months of arriving there, Mr. Jackson was designated to the SHU where he was held in solitary confinement for more than nine months.  During his final month in the SHU, a member of USP Hazelton's psychological staff assessed Mr. Jackson in response to a complaint from him about his deteriorating mental health.    The BOP staff member failed to acknowledge Mr. Jackson's previous diagnosis of schizophrenia, but nonetheless concluded he suffered from a Major Depressive Disorder that was chronic, recurrent, and not improving:

> Inmate Jackson has a history of depression. He was reportedly treated with psychopharmacological intervention (Prozac) and considered to be in remission. Inmate Jackson endorsed or displayed the following symptoms:

---

[15]    *See* Terre Haute Record, attached hereto as **Exhibit 8.**

Insomnia (2 hrs of sleep per night), poor concentration, sadness/depressed mood for more than 2 weeks, weight loss, decrease in appetite, helplessness. He denied suicidal ideation at this time. Based on contacts with the inmate, a review of available documentation and clinical interview on this date, inmate Jackson is diagnosed with Major Depressive Disorder, recurrent, moderate … Based on the assessment by psych services the pt will be restarted on medication.

Assessment: Axis I: Major Depressive Disorder: Recurrent Episode: Moderate, F33.1-Current, Chronic, Not improved/Same.[16]

74.     In June 2015, the BOP transferred Mr. Jackson from USP Hazelton to the USP Lewisburg SMU. An intra system transfer record dated June 19, 2015, generated just days prior to Mr. Jackson's arrival at the USP Lewisburg for his first stint at the SMU noted he suffered from Major Depressive Disorder that was chronic, recurrent, and not improving.

75.     Mr. Jackson appealed the SMU designation to the National Inmate Appeals Administrator in the BOP Central Office in Washington D.C. Mr. Jackson submitted a letter detailing the reasons he was a poor candidate for the SMU program, including his previous mental health diagnoses, the recurring symptoms of his mental illness, the decompensation he experienced in the SHU at USP Hazelton, his intellectual disability, and the lack of supports and treatment that would make it difficult for him to survive the SMU program without irreparable

---

[16]     *See* USP Hazelton Record, attached hereto as **Exhibit 9.**

harm.[17] Mr. Jackson received no response at all from the BOP Central Office. The

BOP transferred Mr. Jackson to the SMU on June 22, 2015.

76.     While in the SMU between June 2015 and November 2016, Mr.

Jackson made repeated attempts to obtain medical care for his worsening mental

health symptoms, to no avail. On August 4, 2015, Mr. Jackson wrote a letter

stating:

> Dear PA my conditions of depression has worsen I need
> to see a doctor
>
> Dear PA I have a severe case of mental depression and
> was on prozac when I arrived June 22, 2015. Since then
> my medication has been cancel and my depression has
> worsen. Could you please get me in to see the doctor so
> that my prescription can be reorder. Thank you. David L.
> Jackson, 13567039[18]

77.     Five days later, Mr. Jackson wrote again, this time addressing the

letter to a doctor:

> Dear Doctor,
>
> I'm currently taking Prosac [sic] for my depression. I
> have been sending cop-out requesting to see you as I
> have schizophrenia which has been flairing up more and
> more I would like to please get back on my Risperdal or
> whatever treatment you feel will help I mention
> Risperdal because this is the last treatment I was on. You
> can check my medical records for verification 2009.
> Please get back to me. Thank you. David Lee Jackson
> 13567039

---

[17]     *See* SMU Designation Central Office Appeal Letter, attached hereto as **Exhibit 10.**

[18]     *See* August 4, 2015 Letter from DLJ to PA, attached hereto as **Exhibit 11.**

I also have irritable bowel syndrome.  I have been having stool movements 5 to 7x a day I've tried stomach relief products from the canteens here and hazelton.  But my problem is still adverse.  I have been having this problem about 2 months now.[19]

78.    A note at the bottom of page contains the sole documented response to Mr. Jackson's plea for help: "1) You do not have schizophrenia. 2) Also the Fluoxetine may be causing your abdominal symptoms.  Please stop the Prozac."[20]

79.    On December 3, 2015, after Mr. Jackson again reached out for help, records indicate he was re-routed by BOP staff back into the agency's protocol for obtaining basic mental health care, a byzantine process that is all the more difficult for Mr. Jackson to navigate due to his intellectual disability:

> Responded to inmate Jackson's cop-out in which he requested consultation with a psychiatrist for his 'ongoing depression and schizophrenia.'  He also reported his 'depression has gotten worser,' but did not identify specific symptoms, and inquired about a proper medication regimen.  Inmate Jackson was advised that Health Services addresses all medication requests.  He was also informed that interventions addressing adaptive coping strategies are available in addition to SMU Psychology Programming.  He was encouraged to submit another cop-out or address his concerns during rounds with the psychologists and unit's assigned treatment specialist.[21]

---

[19]    *See* August 9, 2015 Letter from DLJ to Doctor, attached hereto as **Exhibit 12.**

[20]    *Id.*

[21]    *See* December 3, 2015 Response to DLJ, attached hereto as **Exhibit 13.**

80.     Mr. Jackson was transferred from the SMU to USP McCreary on December 22, 2016.

81.     On September 5, 2017, while at USP McCreary, BOP designated Mr. Jackson for placement in the SHU for six months.

82.     After being placed in the SHU following one of the above-noted non-violent infractions, BOP transferred him for a second time to the USP Lewisburg SMU.

83.     Once again, Mr. Jackson, with the assistance of counsel, sought to inform critical BOP decision-makers about his mental health history and intellectual disability in an effort to persuade them that Mr. Jackson's mental health would continue to deteriorate in the SMU and that he would not receive necessary medical care and support in the SMU setting.

84.     On January 3, 2018, Mr. Jackson's prior counsel submitted a letter to the Disciplinary Hearing Officer (DHO) for the Mid-Atlantic Region of BOP, copying the Regional Director for the Mid-Atlantic Region of BOP, both of whom had the authority to deny USP McCreary's request to place Mr. Jackson in the SMU.[22] The letter described Mr. Jackson's documented mental illnesses and intellectual disability, notified the letter's recipients of the decompensation Mr.

---

[22]     *See* January 3, 2018 Letter to DHO and Regional Director, attached hereto as **Exhibit 14.**

Jackson had experienced during his previous SHU and SMU placements, and concluded with the following:

> I am concerned that BOP will relegate Mr. Jackson for the rest of his life to a cycle of recurring lengthy SHU and SMU placements every time he is written up for a disciplinary infraction, making it virtually impossible for him to ever recover from his serious mental illness and adjust to life in general population, as the language of PS 5310.16 envisions. I write today with the sincere hope that you can interrupt the cycle now before it sets in, see that Mr. Jackson is provided with the life supports, programming, and mental health treatment he needs, and allow him a chance to get back on track toward successful reintegration in general population rather than sending him to the SMU at this time.[23]

85.     Neither Mr. Jackson nor his prior counsel received a response to the letter.  At his January 11, 2018 video-conferenced disciplinary proceeding on the SMU referral designation, Mr. Jackson submitted documentary evidence to the presiding officer—the same DHO who received prior counsel's letter—including the BOP records containing Dr. Bouchat's diagnoses and clinical observations, and additional information about the medications he had been prescribed in BOP custody.[24]  Mr. Jackson was nonetheless designated again to the USP Lewisburg SMU, where he has been held since March 12, 2018.

---

[23]     *Id.*

[24]     *See* January 11, 2018 DHO record noting DLJ submitted documentary evidence, attached hereto as **Exhibit 15.**

86.     Despite Defendants' awareness of Mr. Jackson's mental status, and despite having policies that purport to make a commitment to finding and considering alternatives to SMU designation for individuals like Mr. Jackson, his mental health continued to deteriorate while in the SMU program.  The restrictive conditions of confinement in the SMU—and the lack of adequate supports or mental health care available to Mr. Jackson there—exacerbated the symptoms of his mental illness.  Under the stress of these conditions, Mr. Jackson suffered from paranoia, powerful mood swings, racing thoughts and recurring nightmares, and pressured speech, among other symptoms.

87.     BOP Program Statement 5310.16 memorializes the classification system and associated mental health services and provisions for inmates, and has a significant impact on services the inmates receive.  Yet, as has been documented elsewhere, BOP personnel routinely ignore this policy in classifying the mental health care levels of men in the SMU.[25]  This has been Mr. Jackson's experience: although he has been diagnosed repeatedly with serious mental illness and informed Defendants of his mental illness, intellectual disability, trauma history and decompensation, he continues to be classified as CARE1-MH in the SMU, meaning BOP sees him as having no significant mental health needs.

---

[25]     *See* Exhibit 1.

88.     As a result of the SMU's CARE1-MH designation, Mr. Jackson was never removed from his cell for the private mental health counseling sessions available to CARE2-MH inmates.  Instead, the only sessions conducted by BOP's Psychology staff are through Mr. Jackson's cell door in the immediate presence of a correctional officer and at times, his cellmate, and within an earshot of other men housed nearby.  Although he is desperate for treatment, Mr. Jackson was not comfortable discussing private, confidential medical issues publicly for fear of ridicule, discrimination, and possibly violent repercussions.

89.     Evaluations by the psychology staff at SMU consisted of little more than "observations" made of Mr. Jackson through his cell door and a limited number of questions about his day.

90.     As a result of the SMU's approach to medical care for inmates classified as CARE1-MH, the BOP and its employees cornered Mr. Jackson into remaining silent.  Because Mr. Jackson declined to discuss his severe mental health issues publicly, BOP's staff recorded Mr. Jackson as having no mental health issues at all.

91.     In addition to these cursory sessions, the so-called "treatment" Mr. Jackson received in the SMU consisted of the prison staff passing out coloring

books and puzzles, an inadequate substitute for the meaningful mental health care and supports he needs.[26]

92.     BOP Program Statement 6340.04,  "Psychiatric Services," expresses the BOP's commitment to providing "essential cost-effective, high quality, and humane diagnostic and treatment services throughout … inmates' incarceration," but there is no psychiatrist at the SMU at USP Lewisburg.  Mr. Jackson's previous attempts to obtain even a tele-psychiatry consultation, during which he interacts with a psychiatrist who appears on a video screen—an inadequate substitute for in-person psychiatric care—have been rebuffed, as noted earlier.

93.     BOP Program Statement 6340.04 also expresses a commitment to the "[c]ontinuation of psychiatric treatment initiated at other institutions or prior to incarceration", but there  has  been  no  continuation  of  such  treatment  for  Mr. Jackson.  On the contrary, psychology staff at the SMU have denied him access to previously prescribed mental health medication.

94.     Mr. Jackson has attempted to submit cop-outs, medical requests, and grievances to gain access to more meaningful mental health treatment but his requests have repeatedly been denied.

95.     Mr. Jackson's serious mental illness, intellectual disability, and his trauma history  and  associated  substance  addiction  have  all  been  known  to  the

---

[26]     *See* **Exhibit 16.**

Defendants and should have provided an ample basis for precluding him from being designated to the SMU. Yet, he has been placed there twice within a span of three years. The restrictive conditions there, combined with the aforementioned lack of meaningful mental health care or supports for him have subjected him to unconscionable and unnecessary pain and suffering, and have caused his mental health to deteriorate significantly.

## CLAIM FOR RELIEF

### Defendants' Repeated Designation of Mr. Jackson to USP Lewisburg's Special Management Unit (SMU) Violated the Eighth Amendment to the United States Constitution

96.     Mr. Jackson incorporates by reference the forgoing paragraphs of this Complaint into this Section.

97.     The Eighth Amendment prohibits cruel and unusual punishment.

98.     Defendants' repeated designation of Mr. Jackson, who suffers from serious mental illness and intellectual disability, to the SMU program violated his Eighth Amendment rights.

99.     Defendants' policies, practices, and procedures in connection with their designation of Mr. Jackson to the SMU program systematically violated his Eighth Amendment rights.

100.    Such policies, practices and procedures include, without limitation:

- Confinement of Mr. Jackson, who suffers from serious mental illness and intellectual disability, in the SMU for conduct directly attributable to his mental illness;

- A disciplinary system that does not consider Mr. Jackson's serious mental illness and the impact of isolation in assessing whether to sanction him or, if so, the nature of the sanction;

- Failure to provide minimally adequate psychiatric and psychological services to Mr. Jackson, who has been diagnosed with serious mental illness, while in the SMU, resulting in unnecessary pain and suffering;

- Refusal to consistently provide prescribed medications for treatment of Mr. Jackson's psychiatric conditions;

- Maintenance of conditions in the SMU that exacerbate Mr. Jackson's serious mental illness, including near-constant isolation with little if any human contact; and;

- Failure to make available, maintain, and utilize adequate therapeutic alternatives to the SMU for Mr. Jackson.

101.   Defendants know or are deliberately indifferent to the fact that Mr. Jackson suffers from serious mental illness and intellectual disability, and despite his condition, Defendants have placed him in the SMU for extensive periods.

102.    Defendants know or are deliberately indifferent to the fact that confinement in the SMU creates a substantial risk that the mental health of Mr. Jackson, who suffers from serious mental illness and is intellectually disabled, will deteriorate.

103.    Defendants have acted, or failed to act, with deliberate indifference to Mr. Jackson's health and safety, despite being aware of his serious mental illness and intellectual disability.

104.    As a direct and proximate result of their acts and omissions, Mr. Jackson's Eighth Amendment rights have been violated, are being violated, and will continue to be violated.

## PRAYER FOR RELIEF

Plaintiff David Jackson therefore respectfully requests that this Court grant the following relief:

105.    Exercise jurisdiction over this action;

106.    Issue appropriate declaratory and injunctive relief to stop the constitutional violations described above and to ensure that Mr. Jackson is not designated and/or transferred to the SMU program at USP Lewisburg;

107.    Award reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988;

108.    Grant such other relief as this Court deems just and proper.

120731966_3

Respectfully submitted,


*/s/ Claire Blewitt Ghormoz*
Claire Blewitt Ghormoz
(PA Id. No. 320816)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
(215) 575-7000 - telephone
(215) 575-7200 – facsimile

*Attorneys for Plaintiff, David Lee Jackson*

Dated:  February 19, 2019